1  JEFFREY H. WOOD
   Acting Assistant Attorney General
2
3  NICOLA T. HANNA
   United States Attorney
4
5  MATTHEW R. OAKES
   CHERYL MACKAY
6  RUFUS JUSTIN SMITH
   United States Department of Justice
7  Environment and Natural Resources Division
   Law and Policy Section
8        Ben Franklin Station, P.O. Box 7415
9        Washington, D.C. 20044
         (202) 514-2686
10       (202) 514-4231 (fax)
11 Counsel for the United States of America
12
13            UNITED STATES DISTRICT COURT
14       FOR THE CENTRAL DISTRICT OF CALIFORNIA
15               SOUTHERN DIVISION
16
17                                    Case No. 2:16-cv-08373-PA-KS

   GARY LUNSFORD,                     UNITED STATES' OPPOSITION TO
18                                     ENTRY OF THE PROPOSED CONSENT
        Plaintiff,                     DECREE
19
        v.
20
   ARROWHEAD BRASS
   PLUMBING And                       The Honorable Percy Anderson
21 ARROWHEAD BRASS &
   PLUMBING, LLC.
22
        Defendants.
23
24
25
26

# TABLE OF CONTENTS

GLOSSARY ............................................................................................iv

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ....................................................................................1

I.  The Exceedances that Form the Factual Basis for Plaintiff's Claims Are Not, By Themselves, Enforceable ...................................................................4

  A. An NAL Exceedance, Alone, is not a CWA Violation....................................5

  B. Plaintiff's Alleged Water Quality Standard is Unclear and Violations of a Water Quality Standard Generally Cannot be Determined Solely by Stormwater Effluent Characteristics ..................................................6

  C. Plaintiff's NOV Letter and MTE Fails to Explain Any Valid Basis for a CWA Claim .............................................................8

II.  The Injunctive Relief Contained in the CD Fails To Address Plaintiff's Alleged Violation ............................................................12

III.  Other US Concerns Remain Unaddressed ........................................14

IV.  Brodsky & Smith's Pattern of Litigation Should be Subject to Scrutiny ......16

V.  Plaintiff Fails to Adequately Support Their Claimed Fees............................19

  A. Plaintiff Has Failed to Provide Contemporaneous Billing Records. ............21

  B. Plaintiff Has Failed to Establish a Reasonable Hourly Rate.........................23

  C. The "Special Circumstances" Test Applies Only to a Denial of Fees...........23

CONCLUSION.......................................................................................24

i

# TABLE OF AUTHORITIES

**CASES:**

*Am. Broad. Co. v. Miller*, 550 F.3d 786, 788 (9th Cir. 2008) ................................23

*Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp. 2d 914, 924 (C.D. Cal. 2009)........5

*Bauer v. Sampson, 261 F.3d 775, 785–86 (9th Cir.2001)*...................................23

*Blum v. Stenson*, 465 U.S. 886, 895, n. 11 (1984)..................................................21

*Borunda v. Richmond*, 885 F.2d 1384, 1392 (9th Cir. 1988)................................24

*California Sportfishing Protection Alliance v. Forever Resorts,* Case No. 2:16-cv-01595 at 3 (Oct. 31, 2017 Order, E.D. Cal.) .....................................................19

*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008)...................23

*Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). ...............20

*Federal Ins. Co. v. Scarsella Bros., Inc.*, 931 F.2d 599, 603 (9th Cir. 1991) .........14

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004)......................................19

*Gilbrook v. City of Westminster*, 177 F.3d 839, 878 (9th Cir. 1999) .....................23

*Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987).....2, 12

*Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)....................................................20

*Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir.1989). ...........................................14

*Joe Hand Promotions, Inc. v. Be*, 2011 WL 5105375, at *7 (N.D. Cal. 2011).......21

*Junker v. Eddings*, 396 F.3d 1359, 1366 (Fed. Cir. 2005) .....................................22

*Lorillard Tobacco Co. v. Super 99 Outlet*, 2005 WL 8156274, at *6 (C.D. Cal. Sept. 27, 2005)...................................................................................................21

*MacKinnon v. Truck Ins. Exchange*, 73 P.3d 1205 (2003).......................................14

*Mendez v. County of San Bernardino*, 540 F.3d 1109, 1126 (9th Cir. 2008)..........23

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008)....................21

*Polar Intern. Brokerage Corp. v. Reeve*, 187 F.R.D. 108 (S.D.N.Y. 1999) ...........23

*Sierra Club v. Electronic Controls Design*, 909 F.2d 1350 (9th Cir. 1990) ...........17

*St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d
    1054, 1059, 1061 (9th Cir. 2009) ........................................................20

*Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003) ............................18, 19

*Zynga Game Network Inc. v. Erkan, 2010 WL 3463630, at *2 (N.D. Cal. 2010)*...21

**STATUTES**

33 U.S.C. § 1365(d) ........................................................................20

33 U.S.C. 1365(c)(3) .......................................................................19

33 U.S.C. § 1365 (b) .......................................................................17

**REGULATIONS**

40 CFR Part 131.38 ......................................................................4, 6

**LEGISLATIVE:**

133 Cong. Rec. S. 737 (daily ed. Jan. 14 1987) ..................................3, 24

iii

# GLOSSARY

| | |
|---|---|
| BAT | Best Available Technology Economically Achievable |
| BCT | Best Conventional Pollutant Control Technology |
| BMPs | Best Management Practices |
| CD | Consent Decree |
| CWA | Clean Water Act |
| IGP | Industrial General Permit |
| MTE | Motion to Enter |
| NALs | Numeric Action Levels |
| NOV | Notice of Violation |
| Statement | United States' May 18, 2018 Statement of Concern |
| SWPPP | Site-Specific Storm Water Pollution Prevention Plan |

iv

# INTRODUCTION

The United States—supported by Declarations by the State of California and U.S. Environmental Protection Agency—objects to the entry of Plaintiff Lunsford and Defendant Arrowhead's Consent Decree (CD).  *See* EPA Decl. (Ex. A); California Decl. (Ex. B).

Over the past several decades, federal and state regulatory agencies have developed innovative tools to address the difficult problems presented by stormwater pollution under the Clean Water Act (CWA).  Stormwater pollution is generated at widely dispersed sources—many of them small businesses, construction sites, or private homes—through things as common as rainwater coming off gutters, parking lots, or fertilized lawns.  Controlling stormwater pollution often requires site-specific measures.  The problem is complex.  For example, the California Industrial General Permit (IGP) Plaintiff seeks to enforce is more than 200 pages long (including attachments).

Stormwater regulation necessarily involves a balance of effective control of pollution with the appropriate burden to place on the large number of affected dischargers given the common, yet site-specific nature of these issues.  California, in its IGP, created a carefully calibrated system to strike that balance.  In California, where stormwater discharges covered by the IGP exceed specified levels, that permit triggers a series of obligations.  These obligations are not, in the first instance, "violations" of the CWA.  The discharger must hire technical experts to assess their stormwater management practices.  They must file reports explaining how they will amend their management practices.  In many cases, they must file reports assessing whether their amended practices are effective.  A

separate, but similar, system involving water quality standard corrective actions applies to stormwater measurements that exceed the pollutant standards set by the California Toxics Rule.  California designed these programs to decrease pollutant discharge and improve permittees' management practices.  It established a system under which self-monitoring, public disclosure, and expert analysis combine to provide a self-regulatory mechanism tailored to the circumstances of a specific site.  The exceedances that prompt participation in these programs are intentionally and expressly not subject to civil enforcement actions.

So premature enforcement—without diligent factual development and before there is an actual "violation"— disrupts the calibrated self-regulatory system established by Congress, as implemented by the State of California.  As the attached Declaration from the State of California indicates, Ex. B at ¶¶ 8-11, the State of California—like the United States—is concerned about the way in which the California stormwater permit has been invoked in this case.  The claims here are primarily based on self-reported actions and data available in public databases and on other public sources such as meteorological information.  Such self-reported information does not necessarily indicate any CWA violation.  If small businesses and individuals believe such data may become the basis of a Clean Water Act Notice of Violation (NOV) or citizen suit before they have even committed an enforceable violation, their incentives to voluntarily participate in such innovative stormwater regulation programs will be affected. *Cf. Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49, 61 (1987).

Not only can premature prosecution of such claims undermine the balance between voluntary compliance and enforcement, the United States has a statutory

2

role in ensuring that parties use the CWA citizen suit provision in an appropriate manner.  Congress expected that the United States would monitor citizen litigation and seek to address "abusive, collusive or inadequate settlements," 133 Cong. Rec. S. 737 (daily ed. Jan. 14 1987).  Pursuant to this statutory oversight role, on May 18, 2018, the United States filed a Statement of Concern (Statement) regarding the CD here (Dkt. 51).  The concerns derive, in part, from Plaintiff's counsel having asserted 158 CWA "violations," principally based on self-monitoring data, in a short period of time.  Yet it appears that Plaintiff's counsel has conducted little or no site-specific investigation to establish whether there actually are CWA violations in many of these instances.

On June 11, 2018, Plaintiff filed a Motion to Enter (MTE) this CD, without amendment.  MTE (Dkt. 53).  By objecting to this motion, the United States does not take lightly that private parties engaged with the court's mediators to resolve these claims.  The United States supports citizen suit enforcement of environmental laws.  In many cases, it plays a valuable role in supplementing Federal and State enforcement.  But a small business faced with an action of this type may feel compelled to settle simply to avoid litigation costs, irrespective of the merits of the claim.  Premature citizen suit enforcement actions, based on insubstantial or incomplete evidence using tools developed by regulators to enhance compliance and avoid litigation, can disrupt the permitting scheme.  The CD under review settles claims that are expressly not violations of the IGP.  Other claims addressed in the CD are poorly developed, appear to be based on non-violation exceedances, and it does not appear Plaintiff investigated sufficiently to determine if an actual violation occurred.  Plaintiff's attorneys' fees may also be

overstated, as there is little justification for those fees.  Additionally, some CD terms are ambiguous—one CD term would actually penalize Defendant's compliance with the IGP.

The United States does not assert that no CD can ever be entered between these parties.  The parties may be aware of further facts that—if provided—may establish a violation of the CWA and justify the entry of a CD to address them. The United States welcomes—indeed, has informally sought—that information from Plaintiff's counsel.  The United States simply submits that Plaintiff's Motion to Enter *this* current CD, which includes resolutions of non-violations of a self-regulatory compliance program, should be denied for the reasons set forth below.

## I.      The Exceedances that Form the Factual Basis for Plaintiff's Claims Are Not, By Themselves, Enforceable

The United States objects to the CD because it resolves, in part, "claims" that are not actual violations of the CWA.  Premature enforcement based on data and actions in a self-regulatory compliance scheme undermines those efforts to redress stormwater pollution problems.

A complaint must give Defendant fair notice of the basis of Plaintiff's claim and the grounds upon which it rests.  Fed. R. Civ. Pro. 8(a)(2).  Plaintiff's complaint does not explain the factual basis of Plaintiff's claims.  Plaintiff instead points to Plaintiff's NOV letter for facts supporting Defendant's alleged violations. MTE at 6-8; NOV (Dkt. 56-3).  The allegations in Plaintiff's NOV indicate that the foundation of Plaintiff's claims are exceedances of Numeric Action Levels (NALs) and water quality standards contained in 40 CFR part 131.38.  Stormwater runoff that contains exceedances of an emissions "benchmark" or a NAL, standing alone,

4

is not a violation of the CWA or of California's IGP. *See generally Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914, 924 (C.D. Cal. 2009) ("The Court holds that the EPA Benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs, but that samples in excess of those benchmarks do not necessarily constitute a violation of the General Permit."). Similarly, the United States is not aware of any information sufficient to indicate that Defendant contributed to exceedances of a water quality standard or has failed to comply with any Water Quality Based Corrective Action requirements.

### A. An NAL Exceedance, Alone, is not a CWA Violation

As we describe more completely in the U.S. Statement (at 8-9), a key component of the IGP is a set of NALs. If stormwater runoff contains NAL exceedances a discharger is required to take a specified set of actions (Exceedance Response Actions) designed to assess and, if necessary, improve their stormwater management practices. As explained in the IGP, "NALs are designed to provide feedback on industrial sources of pollutants." IGP ¶ 66. Because the NALs are intended to provide feedback and encourage dischargers to take action ***before*** a CWA violation takes place, an NAL exceedance is expressly ***not*** a permit violation. *Id. See also* IGP ¶ 64 ("ERAs are designed to assist Dischargers in complying with this General Permit."). The IGP makes this crystal clear, stating:

> The NALs are not intended to serve as technology-based or water quality-based numeric effluent limitations. The NALs are not derived directly from either BAT/BCT requirements or receiving water objectives. NAL exceedances defined in this General Permit are not, in and of themselves, violations of this General Permit.

IGP ¶ 63.  Plaintiff, in his NOV, cites to EPA benchmarks contained in the 2008 Multi-Sector General Permit as the basis for some of Defendant's alleged violations.  NOV at 9 (MTE Ex. 3).  Those benchmark levels are incorporated into the IGP as NALs.[1]

### B.   Plaintiff's Alleged Water Quality Standard is Unclear and Violations of a Water Quality Standard Generally Cannot be Determined Solely by Stormwater Effluent Characteristics

It appears that Plaintiff has cited to an inapplicable saltwater lead and zinc 4-day and 1-hour average water quality standards in their NOV as the source of their violations.  *See* NOV at 9.  Plaintiff, in his NOV, identifies the Los Angeles River and Watershed as the "affected water."  NOV at 2.  That river and watershed are predominantly freshwater, and the drainage point for Defendant's discharge is into a portion of the river approximately 21 miles upstream from the uppermost section of the Los Angeles River Estuary (where saltwater standards would apply).  EPA Decl. ¶ 10.  Plaintiff cites to 40 CFR Part 131.38[2] as the source of water quality standards exceeded, but without explanation, appear to list only saltwater standards for the receiving body.  NOV at 9.  Where runoff is into fresh water, the United States expects freshwater standards to apply.  EPA Decl.  ¶ 10.   Yet there is no

---

[1] *See* California IGP Fact Sheet at 2 (Ex. C) ("As discussed in this Fact Sheet, this General Permit requires Dischargers to: . . . Compare monitoring results for monitored parameters to applicable numeric action levels (NALs) derived from the U.S. EPA 2008 Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity (2008 MSGP) and other industrial storm water discharge monitoring data collected in California[.].").

[2] 40 CFR Part 131.38, also called the California Toxics Rule, lists federally promulgated water quality standards for toxic pollutants in the state of California.  The May 18, 2000 California Toxics Rule defined water quality standards for zinc and lead in both saltwater and freshwater conditions.  *See* 40 CFR 131.38(b)(1).  The standard for zinc is more stringent for saltwater than freshwater.  *Id.*

explanation of this important discrepancy.  Additionally, Plaintiff points to water quality objectives measured as a 4-day average or a 1-hour average.  But stormwater runoff is typically tested through a single "grab" sample rather than through longer term monitoring.  EPA Decl. ¶ 6.

Also, Plaintiff's claims do not comport with how water quality standards are used.  "Water quality standards" specify a water body's "designated uses" and "water quality criteria," taking into account the water's "use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes ...." § 303(c)(2).  Water quality standards, which account for multiple sources of discharge, "[A]pply to the quality of the receiving water, not the quality of the industrial storm water discharge. Therefore, compliance with the receiving water limitations generally cannot be determined solely by the effluent water quality characteristics."  IGP ¶ 37.

California implements receiving water limitations and water quality standards through the implementation of Best Management Practices (BMPs). Where a discharger discharges at a level that contributed to an exceedance of a water quality standard, the discharger must implement additional BMPs tailored to that facility.  IGP ¶ 37; IGP Fact Sheet at 22 (Ex. C).  If the discharger or the Water Quality Board determines that they are contributing to or causing an exceedance of a water quality standard they must comply with Water Quality Based Corrective Actions found in Section XX.B of the General Permit.  IGP Fact Sheet at 22; IGP § XX.B.  Failure to comply with the Water Quality Based Corrective Actions is a violation of the IGP.  IGP Fact Sheet at 22.  Plaintiff has not alleged failure to comply with such corrective actions.

7

### C. Plaintiff's NOV Letter and MTE Fails to Explain Any Valid Basis for a CWA Claim

Plaintiff, in his complaint, alleges four claims.  None of those claims states a cause of action for an NAL exceedance.  Instead, Plaintiff alleges claims for:

> 1) violations of unspecified provisions of the IGP and IGP Water Quality Standards through discharge of "polluted stormwater" (Complaint ¶¶ 77-85);
> 2) violations of unspecified IGP effluent limitations due to inadequate development and/or implementation of unspecified BMPs (Complaint ¶¶ 86-93);
> 3) failure to develop and implement an adequate Stormwater Pollution Prevention Plant (SWPPP) (Complaint ¶¶ 94-104); and,
> 4) failure to develop and implement an adequate monitoring and reporting program  (Complaint ¶¶105-110).

Each of these claims could be enforceable, assuming facts support Plaintiff's legal conclusions.  Plaintiff, however, does not plead or otherwise provide those facts—leaving the United States and California to be concerned (particularly in light of the unusual volume of counsel's activity) that Plaintiff is asserting violations merely on pre-enforcement disclosure and compliance actions that should be encouraged, not discouraged.

Plaintiff's complaint does not specify what provisions of the IGP are violated, what Water Quality Standards are exceeded, what effluent limitations are violated, which BMPs are inadequate, or what SWPPP provisions were improperly developed.  Even the monitoring and reporting allegations appear to be derivative of the other poorly developed claims.  *See* Statement at 27-29.

In their MTE, Plaintiff now appears to rely on their NOV to establish the factual basis for his claims.  MTE 6-9.  The factual basis of Plaintiff's NOV letter,

however, appears to rely almost exclusively on NAL exceedances and discharges that purportedly exceeded the water quality standard limitations for lead or zinc. As discussed in Section I.A, these are not CWA violations here.

In the NOV letter, Plaintiff discusses five categories of violation. First, Plaintiff addresses "Discharges in Excess of BAT/BCT Levels." NOV at 3. Plaintiff goes on to explain that those "BAT/BCT Levels" are the "Benchmark values . . . listed in Attachment 1" to the NOV. *Id.* As discussed above, those benchmark values are incorporated into the IGP as NALs, and exceedance of an NAL is not a violation of the IGP. *See* IGP ¶ 63.

The next violation addressed in Plaintiff's NOV involves "Discharges Impairing Receiving Waters." NOV at 4. Plaintiff bases those allegations on discharges that exceed saltwater water quality standards for zinc and lead. NOV at 9. Compliance with receiving water limitations generally cannot be determined solely by measurements of stormwater effluent. IGP ¶ 37. But stormwater effluent measurements appear to be the sole factual basis for the NOV allegations. Also, Plaintiff's specified "affected water" is primarily a freshwater resource, not a saltwater resource. NOV at 2. Additionally, none of the exceedances listed in Attachment 2 to Plaintiff's NOV appear to be for lead. And, these effluent-base allegations do not seem to account for the IGP's method of ensuring that water quality standards are met. The IGP assumes that BMPs will ensure that dischargers meet water quality standards and, where that is not the case, the IGP allows a discharging source or the Regional Water Board to take corrective action. *See* IGP § XX.B. There is no allegation that Defendant has failed to take a required corrective action related to any water quality standard. Bringing a case

9

based on exceedances of water quality standards requires factual development, and there is no indication Plaintiff has done that.  Instead of pointing to any technical or site specific factual development Plaintiff indicates that his NOV was based primarily on desktop research, and then points to that same NOV as containing the factual support for his claim.  MTE at 6-8.

Plaintiff's third alleged violation is based on Defendant's failure to develop a SWPPP that includes BMPs that would alleviate the benchmark, lead and zinc exceedances.  NOV at 5.  This section of the NOV essentially relies on and derives from the same benchmark exceedances that are not (standing alone) a violation of the IGP or the CWA.  *See* NOV at 6 (using NAL exceedance data to demonstrate BMP failures).  Notwithstanding Plaintiff's vague invocation of a "FRCP 34 site inspection" by a "retained environmental expert," MTE at 1, it isn't apparent from this record that Plaintiff did anything other than list benchmark exceedances to conclude that Defendant's SWPPP was inadequate.  While a benchmark exceedance may be evidence of a SWPPP violation, such an exceedance is no a *per se* violation.  It is unclear what investigation Plaintiff undertook before concluding that Defendant's BMPs were inadequate, issuing an NOV, and filing a federal case.

Plaintiff has submitted a technical report, written on May 30, 2018, well after the settlement of this case.  This report indicates that Brodsky & Smith retained a technical expert to conduct a site inspection on October 27, 2017—more than a year after the NOV was issued, and more than a month after Plaintiff filed the complaint here.  *See* Expert Report (Dkt. 56-4).  But Plaintiff's technical expert appears to rely on ***Plaintiff's own allegations*** to support the basis of Plaintiff's claims.  *Id.* at 1-2.  So, the question remains, what facts (other than benchmark

10

exceedances) supported filing Plaintiff's Complaint?  There are not enough particular facts in the Complaint to allege that Defendant's SWPPP was inadequate.

Plaintiff's fourth alleged violation is based on failure to develop and implement adequate monitoring and perform site evaluations.  NOV at 6.  These allegations, too, evidently rely on the same benchmark, lead and zinc exceedances that alone are not IGP violations.[3]  Plaintiff has indicated that required reports were not submitted, and Plaintiff submitted rainfall data.  Dischargers are required to collect samples during qualifying storm events.  A "qualifying storm event" is defined as a precipitation event that: (1) produces a discharge for at least one drainage area; and, (2) is preceded by 48 hours with no discharge from any drainage area.  IGP § XI.B.

Plaintiff's NOV includes a list of dates when they conclude that "a stormwater discharge is likely to have occurred."  NOV at 11.  In support of this, Plaintiff solely references rainfall data.  While rainfall may indicate a qualifying storm event, sampling is not required outside of scheduled facility operating hours.  IGP § XI.C.6.  For example, almost 30% of the rain events listed in Plaintiff's NOV over a five-year period fall on a weekend.  NOV at 11.  It is also reasonable to assume that some of the remaining rain events fell outside of operating hours, but there is no indication that counsel sought to determine whether these rain events met the IGP standard.  We point to these permit conditions to illustrate that

---

[3] *See id.* at 6 ("For example, the data in Attachment 2 [establishing benchmark, lead and zinc exceedances] indicates that Arrowhead Brass's monitoring program has not ensured that stormwater dischargers are in compliance with [the limitations] . . . required by the [IGP].").

Plaintiff's monitoring claim suffers from the same lack of site-specific analysis as their other claims.  While it may be possible to support a monitoring violation solely with information available online, under the circumstances presented here, the United States believes it is reasonable to search further.[4]

Stormwater pollution is a complex, decentralized problem.  Accordingly, California has developed programs that encourage and ensure compliance, while providing notice of and a record for enforcement when actual violations do occur. But this permitting structure is undermined by premature enforcement.  Citizen suits under the Clean Water Act are an "interstitial" remedy that is meant to "supplement" federal and state enforcement, *Gwaltney of Smithfield v Chesapeake Bay Foundation*, 484 U.S. 49, 60-61 (1987), rather than interfering with the underlying permitting structure.

## II.    The Injunctive Relief Contained in the CD Fails To Address Plaintiff's Alleged Violation

Any relief in a proposed consent decree must be measured against and logically tailored to the Clean Water Act violations the decree seeks to redress.  If that relief is unrelated to an underlying violation, it is presumptively inadequate. Because Plaintiff has have not explained what Clean Water Act violations underlie this action (or their 157 other noticed "violations"), it is difficult to assess the adequacy of the relief in this CD.  The United States has sent letters, participated in phone calls, and engaged with Plaintiff's counsel in several discussions, including a lengthy in-person discussion at Department of Justice offices in Washington D.C.

---

[4] Plaintiff's last NOV allegation is for "unpermitted discharges," apparently based on the same benchmark exceedances that, alone, cannot form the basis of a cognizable claim.  NOV at 7. These allegations did not appear to result in a claim in the Complaint filed in this case.

Counsel for both the Environmental Protection Agency and the Department of Justice have repeatedly sought explanations regarding the factual basis of Plaintiff's claims in this case, and have explained that the apparent basis of Plaintiff's claims is insufficient.  The State of California has expressed similar concerns.  California Decl. ¶¶ 8-11.

For example, in its Statement, the United States acknowledges that this litigation may have prompted changes to aspects of Defendant's permit, though it sought additional information because most of those permit changes were embodied in a revised SWPPP roughly a year before the consent decree was signed.  Plaintiff asserts that additional changes resulted from an October 27, 2017 site inspection conducted by his expert.  Smith Decl. ¶ 22.  Plaintiff also claims that the January 2017 SWPPP changes were "a result of" the complaint filed in this case.  MTE at 10.  The SWPPP amendments may provide a benefit to waters of the United States.  But, what aspect of the complaint prompted these changes?

The MTE places great weight on the monitoring claims in the complaint. MTE at 8.  But Plaintiff's relief is generally not related to Plaintiff's monitoring claims.  Instead, the injunctive relief in the CD appears to be related to exceedances of NALs and water quality standards—and Plaintiff has pointed to nothing indicating that those exceedances are connected to enforceable violations.

As discussed above, the IGP has programs that seek to improve BPMs to reduce NAL exceedances and exceedances of numeric water quality standards.  An exceedance alone, however, is an insufficient factual basis for judicial enforcement.  Put another way, except to the extent that Defendant's SWPPP changes impact their monitoring practices, Plaintiff is claiming credit for injunctive

relief that already had occurred a year prior to signatures on the pending consent decree and that are unrelated to the monitoring violation he seems to now rely on. The IGP independently requires SWPPP amendments, and those requirements were tied to exceedances that, without additional information, could not form the sole basis for a CWA claim.

### III.   Other US Concerns Remain Unaddressed

The United States' Statement of Concern cited numerous other issues that Plaintiff's MTE fails to address.  In several instances there is a disconnect between the text of the CD and Plaintiff's asserted intentions regarding the meaning of particular provisions.  Statement at 26-35.  The text of the instrument matters.  An agreement to settle a legal dispute is a contract, and its interpretation and enforcement are governed by familiar principles of contract law.  *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir.1989).  Courts consider a contract provision to be ambiguous when the provision is susceptible to more than one reasonable interpretation.  *MacKinnon v. Truck Ins. Exchange*, 73 P.3d 1205 (2003); *Federal Ins. Co. v. Scarsella Bros., Inc.*, 931 F.2d 599, 603 (9th Cir. 1991).  The CD, as written, will be difficult to enforce.  At a minimum, the parties should revise ambiguous terms of the CD to state their intentions more clearly.

The United States highlighted ambiguities in specified terms of the pending consent decree.  *See* Statement 29-36.  Plaintiff's responses to these concerns are inadequate.  For example, the CD contains an unclear enforcement provision. Plaintiff responds that *he* interprets the CD enforcement provision to allow for judicial enforcement.  But Plaintiff does not indicate that Defendant agrees with his interpretation, and the text of the CD is unclear on this point.  If Plaintiff attempts

14

to enforce terms of the CD related to "a matter governed by a provision of the IGP," under the interpretive rule that the most specific provisions control, the CD could operate to bar the Court from granting relief. *Compare* CD § VI.B (providing that Plaintiff may seek State enforcement for matters governed by the IGP); to CD § VI.C. (for other, non-IGP-related issues, parties may file a motion with the Court). If the parties intend to allow judicial enforcement of IGP-related terms, they should clarify that in the CD. On this issue, alone, the Court could and should deny Plaintiff's MTE and send the CD back to the parties for revisions and clarification.

Plaintiff also states that the Action Plan requirements are "unlikely to cause confusion," and "represents a clear understanding between the parties" that Defendant publicly file and send plaintiff "a report." MTE at 17. As the United States has pointed out, however, the nature of that report is unclear. Statement at 31-34. Is this a report already required under the IGP? Which one? Does the CD penalize compliance with the IGP? If the CD creates an independent reporting requirement, how is it different from any of the IGP-required reports? Even if the parties are not confused, the CD terms are unclear. The United States and California have vested interests in ensuring that any CDs that relate to or implement their regulatory programs are clear and appropriate. The United States requests the parties clarify these issues, as well.

Plaintiff highlights that the CD includes a $15,000 payment "to compensate Plaintiff for costs and fees to be incurred for monitoring." MTE at 4. Plaintiff's counsel clarifies here, and previously represented, that this money will not be used to make a payment to Plaintiff, and will be used to hire an expert to monitor the

15

site.  Similarly, Plaintiff may intend for an environmental project to benefit waters of the U.S., but the agreement on its face is ambiguous.  Statement at 31.  The CD terms should expressly reflect these points in writing.  The MTE should be denied and the CD corrected to reflect Plaintiff's current assurances.

There are also problems created by the structure of the consent decree that are not the result of ambiguous drafting.  Plaintiff clarifies that the CD, in Section IV.C, does penalize submission of IGP Action Reports.  *See* MTE at 18 (Requiring payments when Defendant submits reports required "under the Level 2 scheme as identified in the RPCD and the IGP.").  The United States continues to believe that such payments will impair, rather than facilitate, the IGP's mechanism to encourage BMP improvements.  *See* Statement of Concern at 34-35.

## IV.  Brodsky & Smith's Pattern of Litigation Should be Subject to Scrutiny

In the MTE, Plaintiff agrees that its counsel, Brodsky & Smith, has issued 158 NOVs over a two-year period, and has filed 18 CWA citizen lawsuits during that time.  MTE at 21.  The United States believes that, given the volume and nature of Brodsky & Smith's CWA litigation, this and other consent judgments in their cases warrant heightened scrutiny.

The United States is very concerned that Brodsky & Smith is using IGP voluntary disclosure and compliance programs in a manner that actually undermines the environmental protection goals of those policies.  California's Declaration indicates that the State likewise questions reliance by Plaintiff on NAL exceedances, as well as the practices of counsel more generally.  The MTE states that many of the NOVs were resolved "without a consent decree, settlement

16

agreement, or the alleged violator paying any monies either to the citizen enforcer or to Plaintiff's counsel." MTE at 21 n.13. The MTE fails to mention cases in which Plaintiff's counsel secured an out-of-court settlement resolving the alleged claims in the NOV. As of November 2017, there were 22 such cases. Statement at 7. Plaintiff's counsel has provided the United States with copies of the majority of the settlements in these matters. But these agreements typically include confidentiality provisions, and on this basis Brodsky & Smith would not provide the United States with information regarding cases in which defendant purportedly declined to waive confidentiality. Plaintiff's Nov. 30 Letter n. 3 (Dkt. 51-10).

We attached a typical example of such a settlement as Exhibit M to the U.S. Statement (Dkt. 51-13). As is apparent from the face of the settlement, it is a form document. The settlement instrument contains only general compliance requirements. It lacks relief that is specific to the defendant or that reflects factual analysis of the best way to mitigate defendant's violations. This large body of similar matters based on similar allegations, settled out of court and without any federal or judicial oversight—raises the possibility that prospective defendants are resolving non-violations of these complex stormwater prevention programs primarily to avoid the cost and nuisance of litigation. Therefore, the Court should apply heightened scrutiny to the settlement in this case.[5]

---

[5] The Court can properly consider these NOVs in reviewing this proposed consent judgment. Congress gave citizens the authority to initiate CWA claims, with an NOV letter as the first step in that process. 33 U.S.C. § 1365 (b). The Court's review of this proposed consent judgment can appropriately take considerations of public policy into account, *Sierra Club v. Electronic Controls Design*, 909 F.2d 1350, 1355 (9th Cir. 1990), including the effect of this proceeding on NOVs and their resolution.

1
2
3
4

First, an unknown number of the 158 NOVs remain to be resolved. This is the first CD to receive detailed judicial review. The NOVs and complaints are all very similar. So a decision from this Court analyzing the claims here would provide guidance to all NOV recipients and every entity that has been sued.

5
6
7
8
9
10
11
12
13
14
15
16
17
18

Second, despite the protestations of counsel, MTE at 20, there are significant questions as to the resources Plaintiff's counsel is able to devote to these matters. The firm has six attorneys, and appears to have a substantial practice beyond the 158 CWA NOVs it has filed. Smith Decl. Ex. 15. The NOVs appear to be primarily based on information drawn from a California online database containing information self-reported by the facilities and on other online sources, rather than information developed on site. Counsel appears to have been presenting litigants with form settlements for their signature, and have entered into settlements with respect to a large number of NOVs in this manner. The proposed consent judgments the United States has seen in judicial actions are also very similar. Many of the cases Brodsky & Smith have filed have overlapping plaintiffs who are private citizens who may not be in a position to properly monitor the various cases that the firm has filed on their behalf. Statement at 16 n.4. This raises a question as to whether the consent judgment in this matter is properly tailored to the facts.

19
20
21
22
23
24

Third, "concerns about the fairness of settlement agreement warrant special attention when the record suggests that settlement is driven by fees." *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003). The manner in which Brodsky & Smith has litigated this group of cases suggests that Plaintiff's counsel generally seek to resolve cases quickly, with an emphasis on recovering an award of fees, and with less emphasis on securing appropriate and tailored relief for

25
26

18

environmental protection.  *See Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (stating that "a federal consent decree … must further the objectives of the law upon which the complaint was based").  Even a large firm would have difficulty pursuing this large volume of NOVs through active litigation.  The United States has been informed that Brodsky & Smith has a practice of pressing NOV recipients to enter into a prompt settlement out of court.  Cal. Decl. ¶ 9.  Those out of court settlements appear to provide for limited environmental relief, but include a significant payment of fees to counsel.  Both the form settlements and this proposed consent judgment contain provisions that emphasize the recovery of fee awards, while the provisions relating to enforcement of substantive relief are less stringent.  *See infra* § III.[6]

Where the Court has concerns about the incentives that have driven a proposed settlement, it is appropriate to subject the settlement to additional scrutiny.  *Staton*, 327 F.3d at 952–53.

## V.   Plaintiff Fails to Adequately Support Their Claimed Fees

The existence of a large body of out-of-court litigation is also relevant to the analysis of Plaintiff's claim for attorney's fees in this matter.  Brodsky & Smith's large caseload presumably prompted research and development of complaints, memoranda, letters, and other documents.  Their attorney's fees claims should be

---

[6] Counsel also seek to avoid federal and judicial oversight, as demonstrated by their position that three settlements in judicially filed actions are not subject to United States review or court approval. MTE 21 n.12.  The United States has a longstanding position that such settlements are within the scope of the statutory term "consent judgment," 33 U.S.C. 1365(c)(3), and we routinely request and receive such settlements.  *See generally* Oct. 31, 2017 Order in *California Sportfishing Protection Alliance v. Forever Resorts*, Case No. 2:16-cv-01595 at 3 (E.D. Cal.) (recognizing that federal and judicial review of a CWA citizen suit settlement was appropriate because the action was "between private parties intended to vindicate public interests.") (Ex. D).

19

reviewed to ensure that, to the extent that counsel rely on preexisting legal work, they are not seeking to claim repeat or excessive fees.

The CWA only permits an award of attorneys' fees where "appropriate." 33 U.S.C. § 1365(d).  Pages 44-49 of United States' Statement of Concern set out legal standards and background regarding how a court can make an "appropriate" determination.  As we point out in our Statement and in Section I, *supra*, review of a CWA settlement may not always require an attorneys' fee motion—but the circumstances of this case warranted additional scrutiny, particularly with respect to fees.  Statement at 48-49.  In response to our initial concerns, this Court ordered Plaintiff to file a Motion to Enter.  Order, Dkt. 53.

In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours they claimed.  *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986).  "Where the documentation of hours is inadequate, the district court may reduce the award accordingly."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  A district court should also exclude from the lodestar fee calculation any hours that were not "reasonably expended," such as hours that are excessive, redundant, or otherwise unnecessary.  *See id.* at 434.  A reviewing court may properly discount relief unrelated to the underlying claims. *St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1059, 1061 (9th Cir. 2009).

Next, the district court must determine a reasonable hourly rate, considering the experience, skill, and reputation of the attorney requesting fees.  *Chalmers*, 796 F.2d at 1210.  The fee applicant bears the burden of producing satisfactory evidence "that the requested rates are in line with those prevailing in the

20

community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895, n. 11 (1984).

Absent the submission of detailed contemporaneous time records justifying the hours claimed to have been expended on this case, the Court should give little weight to the figures provided by Plaintiff. *See Joe Hand Promotions, Inc. v. Be*, 2011 WL 5105375, at *7 (N.D. Cal. 2011) ("Without actual billing records, ... the Court gives little weight to ... figures" in a chart "reconstructing" billable time); *Zynga Game Network Inc. v. Erkan*, 2010 WL 3463630, at *2 (N.D. Cal. 2010) (denying motion for attorney's fees where plaintiff failed to attach "actual billing records"); *Lorillard Tobacco Co. v. Super 99 Outlet*, 2005 WL 8156274, at *6 (C.D. Cal. Sept. 27, 2005) ("In seeking attorneys' fees, a plaintiff should generally provide . . . contemporaneous billing records. . .").   Ultimately, in awarding reasonable attorney's fees, the Court "must strike a balance between granting sufficient fees to attract qualified counsel ... and avoiding a windfall to counsel." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008).[7]

## A. Plaintiff Has Failed to Provide Contemporaneous Billing Records

Rather than providing contemporaneous billing records Plaintiff's counsel provides a summary of hours spent engaged in eight generally described categories of tasks.  MTE Ex. 36.  These billing records lack an adequate description of the

---

[7] Plaintiff cites to several CWA CDs entered in California cases that award significant attorneys' fees, and indicate that their CD provisions are "not dissimilar."  The fact that CWA fees have been awarded in other cases does not demonstrate the fee award in the pending CD in this case is reasonable.  Additionally, fees are not based on the content of CD provisions, they are tied to the reasonable amount of attorney time spent to litigate a particular matter.

work performed.[8]  This lack of specificity frustrates the Court's ability to effectively assess whether the time spent on those tasks was reasonable or necessary.  For example, two Partners, Evan Smith and Marc Ackerman, bill a combined 42.9 hours of time in the "Pleading and Motions" category.  Associate Ryan Cardona bills an additional 11.75 hours of time to the same category.  The only pleading filed by Plaintiff is their complaint, which is largely duplicative of CWA complaints Brodsky and Smith previously filed in other cases.  The only motion filed is the instant Motion to Enter, which does not yet include any time billed for a reply brief.  It is unclear what, exactly, was billed to this time category, but billing almost 55 hours of time to adapt a previously drafted complaint and a single motion to enter seems excessive, especially given that the Motion to Enter was required because of Plaintiff's unusual citizen suit practices.  This is not the type of bill that an attorney could expect a reasonable client to pay.

Additionally, Plaintiff's counsel claims that 20 hours of Partner time and 10 hours of Associate time are reimbursable for "future fees."  Paragraph 38 of the Evan Smith Declaration indicates that the parties estimate billing those 30 hours of time to monitor and inspect Defendant's facility during the term of the Consent Decree.  The Consent Decree allows for a single site inspection.  CD § IV.A. Plaintiff fails to explain why monitoring of Defendant's facility is anticipated to take 30 hours of attorney time.

---

[8] *See generally Junker v. Eddings*, 396 F.3d 1359, 1366 (Fed. Cir. 2005) ("Conspicuously absent from this record is the kind of evidence usually analyzed in determining a reasonable attorney fee: hourly time records, full expense statements, documentation of attorney hourly billing rates in the community for the particular type of work involved, the attorney's particular skills and experience, and detailed billing records or client's actual bills showing tasks performed in connection with the litigation.").

The United States has similar concerns with each of the general billable categories identified in Plaintiff's Ex. 36 (Dkt. 53-36). Absent more detailed billing records, however, there is no basis upon which to determine that Plaintiff's claimed attorneys' fee award is "appropriate."

## B. Plaintiff Has Failed to Establish a Reasonable Hourly Rate

Plaintiff's simple assertion of his counsel's preferred hourly rate is insufficient to carry his burden of demonstrating that $750 is a reasonable hourly rate for Mr. Brodsky, Mr. Smith and Mr. Ackerman, or that $395 is a reasonable hourly rate for Mr. Cardona. The fee applicant has the burden "to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008). The United States does not see how the Court can calculate an accurate lodestar based, solely, on counsel's claimed rates.

## C. The "Special Circumstances" Test Applies Only to a Denial of Fees

Plaintiff correctly points out that CWA fees are appropriate so long as "special circumstances" would not prevent a fee award.[9] MTE at 24-25. This

---

[9] It is unclear whether that presumption applies to an award of fees in this action. The "special circumstances" test requires a showing whether (1) "awarding the attorney's fees would further the purposes" of the statute, and (2) "the balance of equities favors or disfavors the denial of fees." *Am. Broad. Co. v. Miller*, 550 F.3d 786, 788 (9th Cir. 2008) (per curiam) (citing *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1126 (9th Cir. 2008); *Bauer v. Sampson*, 261 F.3d 775, 785–86 (9th Cir. 2001); *Gilbrook v. City of Westminster*, 177 F.3d 839, 878 (9th Cir. 1999)). *See also Polar Intern. Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 118–119 (S.D.N.Y. 1999) (rejecting a settlement because "the Court is not satisfied that counsel has adequately investigated the merits of this suit" and "this settlement has earmarks of a non-arm's length, politely collusive settlement: one providing a nonpecuniary benefit of very little value to shareholders and a fairly substantial award of attorney's fees to plaintiff's counsel for a modest amount of work").

argument still misses the point of filing a fee motion—the "special circumstances" test only indicates a rebuttable presumption that a prevailing CWA plaintiff is entitled to fees.  It does not establish the amount of an "appropriate" fee award. *See Borunda v. Richmond*, 885 F.2d 1384, 1392 (9th Cir. 1988).

## CONCLUSION

As set forth above and in the United States' Statement, the United States is concerned that citizen suit practices of Brodsky & Smith and the CD here, in particular, can disrupt the carefully-tailored disclosure and self-regulatory processes designed to deal with the diverse problems created by stormwater pollution under the CWA.  Congress also expected that the United States would monitor citizen litigation and seek to address "abusive, collusive or inadequate settlements," 133 Cong. Rec. S. 737 (daily ed. Jan. 14 1987).  The government is discharging this function—and seeking to protect the integrity of its environmental protection programs—by seeking to ascertain the legal basis of Plaintiff's claims and the adequacy of relief in this matter, consistent with the United States' longstanding position that resolutions of citizen suits should include appropriate relief tailored to the underlying violations.  The United States does not assert that these parties can never make a case that a CD is appropriate.  But this one is not.

For the reasons discussed in this brief and in the United States' May 18, 2018 Statement of Concern, Plaintiff's Motion to Enter should be denied. Moreover, if counsel continue to seek an award of fees based on any remaining

24

claims in this action, the United States requests that the Court order that counsel

submit contemporaneous billing records sufficient to support such an award.

<div style="margin-left:40%">

Respectfully submitted,


JEFFREY H. WOOD
Acting Assistant Attorney General


NICOLA T. HANNA
United States Attorney

</div>

May 18, 2018              */s/ Matthew R. Oakes*
                            MATTHEW R. OAKES, Attorney
                            CHERYL MACKAY, Attorney
                            RUFUS JUSTIN SMITH, Attorney
                            United States Department of Justice
                            Environment and Natural Resources
                            Division
                            Law and Policy Section
                            P.O. Box 7415
                            Washington, D.C.  20044
                            (202) 514-2686

**PROOF OF SERVICE**

On this 18th day of June 2018, UNITED STATES' OPPOSITION TO ENTRY OF THE PROPOSED CONSENT DECREE was served on counsel of record by electronic filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 18th day of May, 2018.


        */s/ Matthew R. Oakes*

MATTHEW R. OAKES, Attorney
United States Department of Justice
Environment and Natural Resources
Division
Law and Policy Section
P.O. Box 7415
Washington, D.C.  20044
(202) 514-2686

26