Evan J. Smith (SBN 242352)
Ryan P. Cardona (SBN 302113)
**BRODSKY & SMITH, LLC**
9595 Wilshire Blvd., Ste. 900
Beverly Hills, CA 90212
Tel: 877.534.2590
Fax: 310.247.0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY LUNSFORD,<br><br>             Plaintiff,<br><br>       v.<br><br>ARROWHEAD BRASS PLUMBING and ARROWHEAD BRASS & PLUMBING, LLC ,<br><br>             Defendants. | Civil Case No.: 2:16-cv-08373-PA-KS<br><br>**CONSENT DECREE**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)** |

SMRH:485078014.3

The following Consent Decree is entered into by and between Gary Lunsford ("Plaintiff") and Arrowhead Brass & Plumbing, LLC ("Arrowhead" or the "Defendant"). The entities entering into this Consent Decree are each an individual "Settling Party" and collectively the "Settling Parties."

**WHEREAS**, Plaintiff is a citizen of the State of California.

**WHEREAS**, Plaintiff alleges he is concerned with the environmental health of the Los Angeles River Watershed, and uses and enjoys the waters of the Los Angeles River, its inflows, outflows and other waters of the Los Angeles River Watershed;

**WHEREAS**, Arrowhead is the owner and operator of a facility operating as a plumbing supply foundry and plumbing parts and components manufacturer located at 5142 Alhambra Ave., Los Angeles, California, hereinafter referred to by the Settling Parties as the "Facility";

**WHEREAS**, Plaintiff's use and enjoyment of these waters are allegedly negatively affected by the pollution allegedly caused by the operations at the Facility;

**WHEREAS**, Plaintiff alleges he acts in the interest of the general public to prevent pollution in these waterways, for the benefit of their ecosystems, and for the benefit of all individuals and communities who use these waterways for various recreational, educational, and spiritual purposes;

**WHEREAS**, the discharges from the Facility are regulated by the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("1997 Storm Water Permit"), and as amended by Order No. 2014-0057-DWQ ("IGP"), and the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA");

SMRH:485078014.3

**WHEREAS**, on August 22, 2016 Plaintiff sent Arrowhead, the United States Environmental Protection Agency ("EPA"), EPA Region IX, the State Water Resources Control Board ("State Board"), and the Los Angeles Water Quality Control Board ("Regional Board") a notice of intent to file suit ("Notice Letter") under Sections 505(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1365(a) and (b). The Notice Letter alleged violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the 1997 Storm Water Permit and the IGP at the Arrowhead Facility[1];

**WHEREAS**, on November 10, 2016, Plaintiff filed a complaint against Arrowhead in the United States District Court, Central District of California (Case No. 2:16-cv-08373-PA-KS), alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Storm Water Permit at the Arrowhead Facility ("Complaint");

**WHEREAS**, Plaintiff alleges Arrowhead to be in violation of the substantive and procedural requirements of the 1997 Storm Water Permit, the IGP, and the Clean Water Act with respect to the Arrowhead Facility;

**WHEREAS**, on March 24, 2017, Arrowhead filed its Answer to Plaintiff's complaint. Arrowhead denies all allegations in the Notice Letter and Complaint relating to the Arrowhead Facility;

**WHEREAS**, on October 12, 2017, the parties conducted a mediation with panel mediator David Cranston, Esquire;

**WHEREAS**, on October 27, 2017, the parties, through their attorneys and environmental consultants, conducted a Rule 34 site inspection of the Facility;

**WHEREAS**, Plaintiff and Arrowhead have agreed that it is in the Settling Parties' mutual interest to enter into a Consent Decree setting forth terms and

---

[1] For purposes of this Consent Decree, the NPDES permit and any amendments thereto in effect at the time of Arrowhead's required compliance with the terms of this Consent Decree shall be referred to as "the Industrial General Permit" or "IGP."

conditions appropriate to resolving the allegations set forth in the Complaint without further proceedings; and

**WHEREAS**, all actions taken by Arrowhead pursuant to this Consent Decree shall be made in compliance with all applicable federal and state laws and local rules and regulations.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

1. The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a);

2. Venue is appropriate in the Central District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Arrowhead Facility is located within this District;

3. The Complaint states claims upon which relief may be granted pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1);

4. Plaintiff has standing to bring this action; and

5. The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce or to extend this Consent Decree.

## I.  OBJECTIVES

It is the express purpose of the Settling Parties entering into this Consent Decree to further the objectives set forth in the Clean Water Act, 33 U.S.C. §§ 1251, et seq., and to resolve those issues alleged by Plaintiff in his Complaint.  In light of these objectives and as set forth fully below, Arrowhead agrees to comply with the provisions of this Consent Decree.  Arrowhead agrees to comply with Receiving Water Limitation VI.A. in the IGP which requires that Arrowhead "shall ensure that industrial storm water discharges and authorized Non-Storm Water Discharges

("NSWDs") do not cause or contribute to the exceedance of any applicable water quality standards in any affected receiving water," and Effluent Limitation V.A. of the IGP which requires that Arrowhead "shall implement Best Management Practices ("BMPs") that comply with the BAT/BCT requirements of the [IGP] to reduce or prevent discharges of pollutants in [Arrowhead's] storm water discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability." Arrowhead shall develop and implement BMPs necessary to achieve compliance with BAT/BCT standards and with the applicable water quality standards as those terms are defined by the IGP.

## II. AGENCY REVIEW AND TERM OF CONSENT DECREE

A. **Agency Approval**. Plaintiff shall submit this Consent Decree to the United States Department of Justice and the EPA (collectively "Federal Agencies") within three (3) days of the final signature of the Settling Parties for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) days after receipt by both agencies, as evidenced by written acknowledgement of receipt by the agencies or the certified return receipts, copies of which shall be provided to Arrowhead if requested. In the event that the Federal Agencies object to entry of this Consent Decree, the Settling Parties agree to meet and confer to attempt to resolve the issue(s) raised by the Federal Agencies within a reasonable amount of time.

B. **Effective Date**. The term "Effective Date" as used in this Consent Decree shall mean the day the Court enters this Consent Decree.

C. **Termination Date**. This Consent Decree shall terminate two (2) years after the Effective Date ("Termination Date"), unless there is a prior ongoing, unresolved dispute regarding Arrowhead's compliance with this Consent Decree.

D. **Inspection of Facility**. Plaintiff may conduct one (1) inspection of the Facility up to forty-five (45) days prior to the Termination Date, on a date and

time to be agreed upon by the Settling Parties. The inspection shall be conducted according to the rules applicable to annual site inspections described below at § IV.A.1 *infra*.

## III. POLLUTION CONTROL REQUIREMENTS

**A.** **Storm Water Pollution Reduction Measures and Arrowhead's SWPPP**

    **1.** Any storm water pollution control measures required by this Consent Decree shall be designed and operated to manage storm water discharges, through full compliance with the IGP.

    **2.** The control measures now in place at the Facility are all contained in the Facility's current Storm Water Pollution Prevention Plan ("SWPPP"), a copy of which accompanies this Consent Decree as Exhibit A.

        a. The current SWPPP, amended in January 2017 after Plaintiff's Complaint was filed in November 2016, addresses, among other things, good housekeeping, preventative maintenance, spill prevention and response, material handling and waste management, employee training, quality assurance and record keeping, waste and garbage, non-stormwater discharges (NSWDs), the monitoring plan, and the annual evaluation. Plaintiff agrees that Arrowhead's current SWPPP, Exhibit A, now contains revisions that bring the Facility closer to compliance with the IGP based, for example, on the water sampling conducted at the Facility to date and BMPs added to the SWPPP in January 2017 to reduce pollutants in the Facility's stormwater discharges. Further, the Settling Parties agree that Consent Decree will aid the Facility in coming into full compliance with the IGP,

including, for example, curing high copper and zinc levels in the Facility's stormwater, the inclusion of Advanced BMPs as set forth herein, affecting a compliant QSE testing schedule, and ensuring proper employee training.

    b.    Arrowhead has engaged a Qualified Industrial Storm Water Practitioner ("QISP") to assist it in preparing the Facility's SWPPP and in implementing all the control measures described in the SWPPP. Arrowhead agrees to continue to engage a QISP for the duration of this Consent Decree.

**3.** The Settling Parties agree that the SWPPP may be modified from time to time as more fully described in this Consent Decree, provided that no such future modification shall cause the SWPPP to not comply with applicable provisions of the IGP. In the event of a modification to the SWPPP or Facility Site Map, Arrowhead will provide a copy of the revised exhibits to Plaintiff in the manner described herein, and to the Regional Board via SMARTs.

**4.** In addition to the activities described in Sections III.A.2(a) and (b) above, Arrowhead will assure the incorporation of the following BMPs, as more fully described in Arrowhead's SWPPP, which shall be implemented at the Facility, the boundaries of which are outlined on the Arrowhead Facility Site Map ("Site Map"), attached as Exhibit "B" hereto.

    **(a)**    **Non-Structural BMPs**

        **(i)**    **Good Housekeeping**

            **a)**    Observe and maintain industrial activity outdoor areas;

            **b)**    Minimize or prevent material tracking offsite;

| | | c) | Minimize dust generated by industrial activities; |
| | | d) | Cleanup areas affected by rinse and wash water; |
| | | e) | To the extent practical, cover stored industrial materials that can be readily mobilized by contact with storm water; |
| | | f) | Contain stored non-solid industrial materials or wastes; |
| | | g) | Prevent improper disposal of rinse/wash waters; and |
| | | h) | Minimize flows of offsite storm water and NSWDs into material handling areas. |

**(ii) Preventative Maintenance**

a) Identify industrial equipment and systems that may leak;

b) Observe the equipment and systems to detect leaks;

c) Establish a schedule for maintenance; and

d) Establish procedures for maintenance and repair.

**(iii) Spill Prevention and Response Procedures**

a) Establish procedures and/or controls to minimize spills and leaks;

b) Develop and implement spill and leak response procedures to prevent industrial materials from being discharged;

c) Clean up spills and leaks promptly;

d) Identify and describe needed spill and leak response equipment; and

e) Train Storm Water Team in appropriate spill response.

(iv) **Material Handling and Waste Management**

  **a)** Prevent or minimize handling of industrial materials or wastes that can be readily mobilized;

  **b)** Contain all stored non-solid industrial materials or wastes that can be transported or dispersed by the wind or rain;

  **c)** Cover industrial waste disposal containers and industrial material storage containers that contain industrial materials when not in use;

  **d)** Divert run-on and storm water generated from the Facility within the Facility away from all stockpiled materials;

  **e)** Clean all spills of industrial materials or wastes; and

  **f)** Observe and clean as appropriate any outdoor material or waste that could cause contamination to storm water if contact is made.

(v) **Erosion and Sediment Controls**

  **a)** Implement effective wind erosion controls;

  **b)** Provide effective stabilization for inactive areas, finished slopes, and other areas prior to a forecasted storm event based on the closest National Oceanic and Atmospheric Administration ("NOAA") weather station;

  **c)** Maintain effective perimeter controls and stabilize site entrances;

  **d)** Divert run-on and storm water generated from within the Facility away from erodible materials; and

SMRH:485078014.3

**e)** Properly design and maintain sediment basins.

**(vi) Employee Training**. Arrowhead's QISP will provide sufficient training to the appropriate team members assigned to perform activities required by this Consent Decree ("Storm Water Team") including:

**a)** Preparing or acquiring necessary and appropriate training manuals;

**b)** Providing a training schedule; and

**c)** Maintaining training documentation.

**(vii) Quality Assurance and Record Keeping**

**a)** Develop and implement management procedures to ensure implementation of plans;

**b)** Develop a method of tracking and recording program implementation; and

**c)** Maintain implementation records (i.e., BMP deployment records, employee training logs, spill occurrence and clean-up records).

**(b) Additional BMPs**. BMPs, as set forth below, will be implemented to the extent appropriate and feasible, in conjunction with industry standards and applicable to the Facility's industrial activities in order to prevent and reduce storm water contact with industrial pollutants, including:

**(i) Additional BMP 1 – Baghouse Dust Collection**

**a)** Arrowhead will ensure that the connection between the baghouse dust collector and the drums are sealed and that BMPs are employed related thereto. Maintenance logs will be kept for events related to dust collector maintenance including changing the

filter cartridges and ensuring that the connection between the dust collector and the containers are sealed after every quarterly container change-out event. Maintenance log notes will be kept indicating that all connections between the dust containers and the drop chutes of the dust collector are sealed and secured. Additionally, monthly BMP inspections include verifications that all container connections are sealed and secured. The contents of the containers are managed and disposed of in accordance with all applicable state and federal regulations. The SWPPP will be amended to include the above descriptions in the appropriate BMP sections.

**b)** Arrowhead will purchase a HEPA Wet/Dry Shop Vacuum, the dust collector area will be HEPA-vacuumed and wet mopped after each Dust Collector maintenance event (on an as-needed basis) or quarterly container change-out. In addition, the area will be observed daily and vacuumed as needed. Monthly BMP inspection documentation forms will be used to document the implementation and maintenance of this BMP. The Facility SWPPP will be revised as needed to reflect these changes. During the interim, whenever maintenance is performed on the unit or material is removed, the containment area will be thoroughly swept.

(ii) **Additional BMP 2 – Roof Sweeping**

    a)    Arrowhead will engage in weekly inspections of the rooftop over the Facility, and sweep it no less than monthly, unless a weekly inspection reveals the need for additional sweeping. The Facility's SWPPP will be revised to reflect this additional BMP.

(iii) **Additional BMP 3 – East Yard**

    a)    Arrowhead will discontinue the use of the plating line adjacent to the East Yard beginning on January 1, 2018. The existing plating line permit will remain in effect, although actual use will be dormant. If the plating line is restarted in the future (under the existing permit), Arrowhead Brass will implement "housekeeping" BMPs (e.g., inspections, vacuuming, maintenance logs, etc.).

(iv) **Additional BMP 4 – Shipping Area**

    a)    Arrowhead will clean the shipping area daily after each work shift with a HEPA shop vacuum and include this area in a daily sweep log. In addition to the aforementioned sweeping, daily observations should be sufficient to ensure the protection from releases into storm water run-off from this area. Daily sweep logs of this and other areas of the facility will be added to the SWPPP and the BMP descriptions for Good Housekeeping will be revised accordingly.

SMRH:485078014.3

(v) **Additional BMP 5 – Materials**

     **a)**     Arrowhead produces castings from purchased alloy ingots made of ASTM alloy C83470. According to the C83470 specifications provided by the Copper Development Association, Inc., this material contains lead (Pb) at 0-0.09% by weight and aluminum (Al) at 0-0.01% by weight. Therefore, Pb and Al are present only in trace amounts as impurities. This content is not significant enough to impact storm water quality. Yet, since Arrowhead is required to sample Al based on their Standard Industrial Classification ("SIC") code, the company will continue to sample for Al. However, due to the relevant information outlined above, Arrowhead will not analyze storm water samples to determine concentrations of lead and the sampling and analysis program for Arrowhead will not change. In the event Arrowhead changes to an alloy that is not lead free, Arrowhead will supplement its testing to include testing for lead and will revise the SWPPP accordingly.

(c) **Non-Storm Water Discharges (NSWDs)**

     **(i)**     Reduce or prevent the contact of authorized NSWDs with materials or equipment that are potential sources of pollutants;

     **(ii)**     Reduce, to the extent practicable, the flow or volume of authorized NSWDs;

SMRH:485078014.3

          **(iii)**    Ensure that authorized NSWDs do not contain quantities of pollutants that cause or contribute to an exceedance of water quality standards ("WQS") as set forth in the RWQCB Basin Plan; and

          **(iv)**    Reduce or prevent discharges of pollutants in authorized NSWDs in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

    **(d)**    **Waste, Garbage, and Floatable Debris**

          **(i)**    Dispose of grass clippings, leaves, sticks, or other collected vegetation as garbage, or by composting.  Do not dispose of collected vegetation into waterways or storm drainage systems; and

          **(ii)**    Waste receptacles exposed to storm water shall be tightly closed or otherwise covered when not in use

**B.**    **Numeric Action Level ("NAL") for Discharges from the Arrowhead Facility.**  Future exceedances of the values presented in Table 1 will indicate to the discharger that additional BMPs may be needed in order to comply with BAT/BCT.

**Table 1: Numeric Action Levels for Discharges**

| Pollutant | Test Method | Units | Annual NAL[2] | Instantaneous Maximum NAL[3] |
|---|---|---|---|---|
| pH | Per IGP Section XI.C.2 | pH units | N/A | Less than 6.0, Greater than 9.0 |
| Oil and Grease | EPA-1664A | Mg/L | 15 | 25 |
| Total Suspended Solids | SM-2540-D | Mg/L | 100 | 400 |
| Zinc, Total | EPA 200.8 | Mg/L | 0.26** | N/A |
| Nitrate plus Nitrite Nitrogen | SM-4500-NO3-E | Mg/L | 0.68 | N/A |

---

[2] An Annual NAL Exceedance occurs when the average concentration for each parameter using the results of all the samples taken for the entire facility over the reporting year.

[3] An Instantaneous Maximum NAL Exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value as illustrated in Table 1.

-14-

| Pollutant | Test Method | Units | Annual NAL[2] | Instantaneous Maximum NAL[3] |
|---|---|---|---|---|
| Iron, Total | EPA 200.7 | Mg/L | 1.0 | N/A |
| Aluminum, Total | EPA 200.8 | Mg/L | 0.75 | N/A |
| Copper, Total | EPA 200.8 | Mg/L | 0.0332** | N/A |

**The NAL is the highest value used by the U.S. EPA based on their hardness table in the 2008 MSGP.

**C.     Level 2 Status**

    **1.     Response Action Level 2 Evaluation and Report for 2017-2018.**
During the 2016-2017 compliance year, stormwater tests conducted at the Arrowhead facility exceeded the NAL for total zinc and total copper.  Accordingly, Arrowhead's QISP shall prepare an Exceedance Response Action Level 2 Evaluation and Report for total zinc and total copper for the 2017-2018 compliance year and submit this report to the Regional Board no later than December 31, 2017.

    **2.     Level 2 Action Report Requirements for 2018-2019.**  If Arrowhead is required to submit any Exceedance Response Action Level 2 Report for the 2018-2019 compliance year, the report shall be prepared by a QISP and include one or more of the following demonstrations:

        **(a)**     The identification of the contaminant(s) discharged in excess of the numeric value(s) in Table 1;

        **(b)**     An assessment of all pollutant sources of each contaminant discharged in excess of the numeric value(s) in Table 1 and the extent to which those contaminants are associated with industrial activities at the Facility; and

        **(c)**     For contaminants associated with industrial activities, the identification of additional BMPs that shall be implemented to achieve compliance with the Table 1 Limit(s).  In the alternative, Arrowhead may submit an evaluation of any additional BMPs that would reduce or prevent an exceedance, estimated costs of

the additional BMPs evaluated, an analysis demonstrating that the additional BMPs needed to prevent the exceedance are not BAT/BCT and are not required to ensure discharges that do not cause or contribute to violations of water quality standards, and an analysis describing the basis for the selection of BMPs implemented in lieu of the additional BMPs evaluated but not implemented.

3. **Implementation Schedule**

(a) The time schedules for implementation of each Level 2 Response Action Report shall ensure that all BMPs are in the process of being implemented as soon as reasonably feasible but in no case later than January 1 following the compliance year during which the exceedance occurred.

(b) Arrowhead shall be entitled to a single time extension of up to six (6) months upon submitting the following information to SMARTS and the Plaintiff:

(i) Reason for the time extension;

(ii) A revised Level 2 Response Action Report describing the necessary tasks that will need to be taken in order to complete the technical report justifying the extension; and;

(iii) A description of the BMPs that will be implemented in the interim until permanent BMPs can be implemented.

(c) Arrowhead shall diligently file and pursue all required local agency applications for permits and/or approvals for the BMPs included in any Exceedance Response Action Level 2 Report. Arrowhead shall further diligently pursue the procurement of contractors, labor, and materials to complete all such BMPs by the deadline for implementing each Level 2 Response Action

Report described in this section, and shall use commercially reasonable efforts to meet these deadlines.

**D.    Sampling and Analysis**

1.  Arrowhead shall install a recording rain gauge capable of recording rainfall to 0.1 inches at the Arrowhead Facility within thirty (30) days of the Effective Date.  Arrowhead shall maintain the recording rain gauge in accordance with the manufacturers' recommendations, maintain records of all maintenance and rain data, and provide such rain gauge data to Plaintiff with the Annual Comprehensive Facility Compliance Evaluation described in Section III. E. below for the term of this Consent Decree.  In the event there is a dispute about the quantity of rainfall at the Facility, the rain gauge installed pursuant to this section shall be deemed to be the actual rainfall at the site.

2.  Within ninety (90) days of the effective date, Arrowhead shall develop a plan for monitoring all storm water and NSWDs from the Arrowhead Facility that meets the requirements of this Consent Decree and Section XI of the Permit, and incorporate same into its SWPPP.

3.  During the duration of this Consent Decree, Arrowhead shall collect samples from at least two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 – December 31) and at least two QSEs within the second half of each reporting year (January 1 – June 30) from each sampling point at the Arrowhead Facility in conformity with its Storm Water Monitoring Implementation Plan ("Monitoring Plan") and in compliance with the IGP, except for times when a minimum of two (2) QSEs as defined by Section XI.B.1. of the General Permit and as determined by data collected from the on-site recording rain gauge required by Section III.D.1. of this Consent Decree do not occur within the referenced time frames.

**4.**     Arrowhead shall comply with the analytical methods as required by Section XI.B of the IGP as more fully described in the Monitoring Plan.

**5.**     Arrowhead shall request that results of all sample analyses required by this Consent Decree be reported to it within thirty (30) days of laboratory receipt of the sample.

**6.**     Arrowhead shall provide the complete laboratory results of all samples collected as required by this Consent Decree to Plaintiff concurrently with the posting of same on SMARTS or no later than thirty (30) days from receipt of the sample results from the laboratory, whichever is sooner

**E.     Annual Comprehensive Facility Compliance Evaluation**

Arrowhead shall submit the Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") to Plaintiff no later than June 15, 2018. The Annual Evaluation shall comply with all applicable requirements of IGP Section XV.

**F.     Storm Water Pollution Prevention Plan Revisions**

**1.**     Arrowhead shall submit an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") to Plaintiff no later than June 15 during each year of this Consent Decree that contains the following information:

**(a)**     A review of all sampling, visual observations, and inspection records conducted during the previous reporting year;

**(b)**     An inspection of all areas of industrial activity and associated potential pollutant sources for evidence of, or the potential for, pollutants entering the storm water conveyance system;

(c)    An inspection of all drainage areas previously identified as having no exposure to industrial activities and materials in accordance with the definitions in Section XVII of the IGP;

(d)    An inspection of equipment needed to implement the BMPs identified in the SWPPP;

(e)    An inspection of any structural BMPs identified in the SWPPP;

(f)    A review and effectiveness assessment of all BMPs identified in the SWPPP for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs.

(g)    An assessment of any other factors needed to comply with the requirements in Section XVI.B.

2.    Within forty-five (45) days after the Effective Date, Arrowhead shall revise its Monitoring Plan for the Arrowhead Facility to incorporate all sampling, analysis, observation, and reporting requirements of this Consent Decree and the Permit.

3.    Arrowhead shall submit the revisions to its Monitoring Plan for the Arrowhead Facility to Plaintiff for review and comment. Plaintiff shall provide comments, if any, to Arrowhead within thirty (30) days of receipt of the Monitoring Plan. Arrowhead shall incorporate Plaintiff's comments into the Monitoring Plan, or shall justify in a writing prepared by a QISP why any comment is not incorporated within fifteen (15) days of receiving comments. Any disputes over the adequacy of the revised Monitoring Plan shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section VI below.

**G. Storm Water Pollution Prevention Plan Revisions**

    **1.** Within forty-five (45) days after the Effective Date, Arrowhead shall revise the SWPPP for the Arrowhead Facility to include all BMPs required by the Consent Decree and comply with all provisions of the Permit.

    **2.** Arrowhead shall submit the revised SWPPP to Plaintiff for review and comment. Plaintiff shall provide comments, if any, to Arrowhead within sixty (60) days of receipt of the SWPPP. Arrowhead shall incorporate Plaintiff's comments into the SWPPP, or shall justify in a writing prepared by a QISP why any comment is not incorporated within fifteen (15) days of receiving comments. Any disputes as to the adequacy of the revised SWPPP shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section VI below.

    **3.** Arrowhead shall engage a QISP to revise the SWPPP for the Arrowhead Facility if there are any changes in the Arrowhead Facility's operations, including, but not limited to, changes to storm water discharge point(s) or revisions and/or additions to the BMPs implemented pursuant to the IGP.

    **4.** Throughout the term of this Consent Decree, Arrowhead shall submit any SWPPP revisions made pursuant to the requirements of this paragraph to Plaintiff for review and comment within ten (10) days of the SWPPP revision. Plaintiff will provide comments, if any, to Arrowhead within thirty (30) days of receipt of such revised SWPPP. Arrowhead shall incorporate Plaintiff's comments into any revised SWPPP, or shall justify in a writing prepared by a QISP as to why any comment is not incorporated within thirty (30) days of receiving comments. Any disputes as to the adequacy of the revised SWPPP

shall be resolved pursuant to the dispute resolution provisions of this Consent Decree, set out in Section VI below.

**H.     Employee Training**

1.     In addition to Section III.A.(3)(a)(vi) above, within ninety (90) days of the Effective Date of this Consent Decree, Arrowhead shall develop and implement a training program, in compliance with Section X.H.1.f., X.H.1.g., and IX of the IGP ("Training Program").  At a minimum, the Training Program shall include at least the following:

(a)     **Language.**  Arrowhead shall conduct the Training Program in English.  If there are any Team Members who do not understand English, then Arrowhead shall conduct the Training Program also in the language or languages in which those identified employees participating in the Training Program understand.

(b)     **Non-Storm Water Discharges.**  Arrowhead shall train all Team Members on the IGP's prohibition of NSWDs, so that employees know what NSWDs are, that NSWDs can result from improper surface washing or dust control methods, and how to detect and prevent NSWDs to ensure compliance with this Consent Decree and the IGP.

(c)     **BMPs.**  Arrowhead shall train all Team Members on BMP implementation and maintenance to ensure that BMPs are implemented effectively to prevent the exposure of pollutants to storm water, to prevent the discharge of contaminated storm water, and to ensure the proper treatment of storm water at the Arrowhead Facility.

(d)     **Storm Water Sampling.**  Arrowhead shall designate an adequate number of Team Members to collect storm water samples from each discharge location as required by this Consent

Decree. The training shall include the proper sampling protocols, including chain of custody requirements, to ensure storm water samples are properly collected, stored, and submitted to a certified laboratory.

    **(e)**   **Visual Observation Training.** Arrowhead shall provide training to all Team Members at the Arrowhead Facility regarding visual observations pursuant to this Consent Decree and the Permit.

2. Training shall be provided by a QISP who is familiar with the requirements of this Consent Decree and the IGP. The training shall be repeated annually or as necessary to ensure that all such Team Members are familiar with the requirements of this Consent Decree, the IGP, and the Arrowhead Facility's SWPPP or Monitoring Plan.

3. Arrowhead shall maintain training records to document compliance with this Section, and shall provide Plaintiff with a copy of these records in its annual monitoring and reporting document described above.

## IV. MONITORING AND REPORTING

### A. Site Inspections.

1. At a date and time agreed upon by the Settling Parties, but no later than forty-five (45) days before the Termination Date, up to three (3) of Plaintiff's representatives may participate in a site inspection of the Facility. The site inspection shall occur during normal business hours. Notice shall be provided by electronic mail to Plaintiff's counsel of record. Plaintiff shall respond by electronic mail and state the names of all persons that will attend the Site Inspection.

2. Plaintiff shall provide Arrowhead with any comments regarding the Site Inspection within five (5) days of the site inspection's completion.

> These comments shall be prepared, signed and certified by Plaintiff's designated QISP. Arrowhead shall respond to Plaintiff's comments within thirty (30) days from receipt; however, Arrowhead is not obligated to respond to any comments regarding the Site Inspection received after five (5) days have passed.

**B.** **Compliance Monitoring and Oversight.** Arrowhead shall make a onetime payment of fifteen thousand dollars ($15,000) to compensate Plaintiff for costs and fees to be incurred for monitoring Arrowhead's compliance with this Consent Decree. Payment shall be made within five (5) business days of the Effective Date payable to "Brodsky & Smith, LLC" via overnight mail.

**C.** **Action Report Payment.** Arrowhead shall pay one thousand five hundred dollars ($1,500.00) each time an Exceedance Response Action Level 2 Report is submitted to Plaintiff after the Effective Date pursuant to the terms of this Consent Decree. It is understood that this payment shall be made a maximum of two times throughout the entire life of this Consent Decree. Payments shall be submitted simultaneously with the submittal of the Action Report. Payments shall be sent to "Regents of the University of California, UCSD," and mailed to UC San Diego Extension, attention Laura Fandino, 8950 Villa La Jolla Drive, Suite A2014, La Jolla, CA 92037-1712.

**D.** **Arrowhead Document Provision.** During the life of this Consent Decree, Arrowhead shall copy Plaintiff on all documents related to storm water quality at the Arrowhead Facility that are submitted to the Regional Board, the State Board, and/or any state or local agency, county, or municipality. Such reports and documents shall be provided to Plaintiff on the date they are sent to the agencies, counties, and/or municipalities. Any correspondence related to Arrowhead's compliance with the Permit or storm water quality received by Arrowhead from any regulatory agency, state or local agency, county, or municipality shall be provided to Plaintiff within ten (10) days of

receipt by Arrowhead. Provided, however, that this Consent Decree shall not require disclosure of any information or documents subject to the Attorney Client Privilege or the Attorney Work Product doctrine.

## V. ENVIRONMENTAL PROJECT & REIMBURSEMENT OF LITIGATION FEES & COSTS

**A.** **Environmental Project.** To remediate the alleged environmental harms resulting from non-compliance with the 1997 Storm Water Permit and IGP alleged in the Complaint, Arrowhead agrees to make a payment of eight thousand five hundred dollars ($8,500) to University of California San Diego Extension Services to fund tuition grants for owners and employees of small businesses (business having no more than 50 employees) affected by the IGP. The payments shall be made within five (5) business days of the Effective Date payable to "Regents of the University of California, UCSD," and mailed to UC San Diego Extension, attention Laura Fandino, 8950 Villa La Jolla Drive, Suite A2014, La Jolla, Ca 92037-1712.

**B.** **Reimbursement of Attorneys' Fees and Costs.** Arrowhead shall pay a total of seventy-six thousand five hundred dollars ($76,500) to "Brodsky & Smith, LLC" for their investigation fees and costs, expert/consultant fees and costs, and reasonable attorneys' fees incurred as a result of investigating and preparing the lawsuit and negotiating this Consent Decree. Payment shall be made payable to "Brodsky & Smith, LLC" within five (5) business days of the Effective Date via overnight mail.

## VI. DISPUTE RESOLUTION

**A.** **Meet and Confer.** A Settling Party may invoke this meet-and-confer process for any instance of alleged non-compliance with this Consent Decree by the other Settling Party by notifying the other Settling Party in writing of the

matter(s) in dispute.  The Settling Parties shall then meet and confer in good faith, either telephonically or in person, and attempt to resolve the dispute informally over a period of thirty (30) days from the date of the notice.  The Settling Parties may agree in writing to extend this time period in an effort to resolve the dispute without outside intervention.

**B.** **IGP Matters.**  In case of allegations by the Plaintiff of violations by Arrowhead of a matter governed by a provision of the IGP, Plaintiff may file requests for appropriate enforcement actions under the IGP with the Regional Water Quality Control Board – Los Angeles Region, and any appeals to the State Water Resources Control Board and the courts of the State of California, in accordance with all applicable provisions California's Porter-Cologne Act, the federal Clean Water Act, and other state and federal laws.  Arrowhead shall have the right to oppose the plaintiff's requests to the Regional Board, the State Board and the courts, in accordance with applicable provisions of state and federal law.

**C.** **Other Matters.**  For allegations by either Settling Party concerning all other matters, the complaining Settling Party may move the Court for a remedy, and the Court shall determine an appropriate motion or hearing procedure to resolve the dispute.  In all such Court proceedings, the Settling Party that invoked the meet-and-confer procedures shall have the burden of demonstrating that the other Settling Party has failed to meet its obligations as set forth in this Consent Decree.

**D.** **Enforcement Fees and Costs.**  In the event that procedures under either sections VI. B. or C. are undertaken, the reasonable litigation costs and fees that the prevailing Settling Party incurs shall be paid by the other Settling Party.

SMRH:485078014.3

# VII. MUTUAL RELEASE OF LIABILITY AND COVENANT NOT TO SUE

**A.** **Plaintiff's Public Release of Claims.** This Consent Judgment is a final and binding resolution between Plaintiff, on his own behalf, and on behalf of the public and in the public interest, and Arrowhead, and its parents, subsidiaries, affiliated entities under common ownership, directors, officers, agents, employees, attorneys, if any (collectively "Releasees"), and shall have a preclusive effect such that no other person or entity, whether purporting to act in his, her, or its interests or the public interest shall be permitted to pursue and/or take any action with respect to any violation of the CWA or the IGP that was alleged in the Complaint, or that could have been brought pursuant to the Notice. Nothing in this Consent Decree waives the rights of the United States to enforce its rights under Federal Law.

**B.** **Plaintiff's Release of Additional Claims.** As to Plaintiff, this Consent Judgment shall have preclusive effect such that he shall not be permitted to pursue and/or take any action with respect to any other statutory or common law claim, to the fullest extent that any of the foregoing were or could have been asserted by him against Arrowhead or the Releasees based on the facts alleged in the Complaint and the Notice, whether or not based on actions committed by Arrowhead.

**C.** **Waiver of Rights Under Section 1542 of the California Civil Code**

    **1.** Plaintiff waives all rights to institute any form of legal action, and releases all claims against Arrowhead, and the Releasees, (referred to collectively in this Section as the "Claims"). In furtherance of the foregoing, Plaintiff waives any and all rights and benefits which he now has, or in the future may have, conferred upon him with respect to the Claims by virtue of the provisions of § 1542 of the California Civil Code, which provides as follows:

1     A GENERAL RELEASE DOES NOT EXTEND TO

2     CLAIMS WHICH THE CREDITOR DOES NOT KNOW

3     OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT

4     THE TIME OF EXECUTING THE RELEASE, WHICH

5     IF KNOWN BY HIM OR HER MUST HAVE

6     MATERIALLY AFFECTED HIS OR HER

7     SETTLEMENT WITH THE DEBTOR.

**2.** Plaintiff understands and acknowledge that the significance and consequence of this waiver of California Civil Code § 1542 is that even if Plaintiff suffers future damages arising out of or resulting from, or related directly or indirectly to, in whole or in part, the facts in the Complaint, Plaintiff will not be able to make any claim for those damages against Releasees.

**D.** **Arrowhead's Release of Plaintiff.** Arrowhead, on behalf of itself, its past and current agents, representatives, attorneys, successors and/or assignees, hereby waives any and all claims against Plaintiff, his attorneys, and other representatives for any and all actions taken or statements made (or those that could have been taken or made) by Plaintiff and his attorney and other representatives, whether in the course of investigating Claims or Otherwise.

**E.** **Parties' Release.** Unless specifically provided for in this Consent Decree, the Parties, on their own behalf and on behalf of their current and former officers, directors, employees, and each of their successors and assigns, and their agents, and other representatives release all persons including, without limitation, all other Parties to this Consent Decree (and each of their direct and indirect parent and subsidiary companies and affiliates, and their respective current and former officers, directors, members, employees, shareholders, and each of their predecessors, successors, and assigns, and each of their agents, attorneys, consultants, and other representatives) from

any additional attorney's fees or expenses related to the resolution of this matter.

F.  Nothing in this Consent Decree limits or otherwise affects any Party's right to address or take any position that it deems necessary or appropriate in any formal or informal proceeding before the State Board, Regional Board, U.S. Environmental Protection Agency, or any other administrative body on any other matter relating to Arrowhead's compliance with the IGP or the Clean Water Act occurring or arising during or after the Termination Date of this Consent Decree.

## VIII.  RETENTION OF JURISDICTION

A.  **Continuing Jurisdiction.**  This Court shall retain jurisdiction over this matter until the Termination Date defined above for the purposes of implementing and enforcing the terms and conditions of this Consent Decree.  The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

B.  **Extension of Time.**  Either Settling Party may move for an extension of the Termination Date on the ground that the other Settling Party will not be in compliance with one or more provisions of this Consent Decree as of the Termination Date.  Any such motion must be filed with the court before the Termination Date and served on the opposing Settling Party at least 21 days before the court hearing date for the motion.  The motion papers must (a) identify the provision or provisions of the Consent Decree with which the moving Settling Party contends the other Settling Party will not comply; (b) describe the nature of each alleged instance of non-compliance; and (c) provide an estimate of the additional time the opposing Settling Party will need to come into compliance, with an explanation in support of the estimate, for each alleged instance of non-compliance.

## IX. MISCELLANEOUS PROVISIONS

**A.** **No Admission of Liability.** Neither this Consent Decree, the implementation of additional BMPs, nor any payment pursuant to the Consent Decree shall constitute or be construed as a finding, adjudication, admission, or acknowledgment of any fact, law, or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation. Arrowhead maintains and reserves all defenses it may have to any alleged violations that may be raised in the future.

**B.** **Construction.** The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in the IGP, the Clean Water Act, or specifically in the Consent Decree.

**C.** **Choice of Law and Venue.** The laws of the United States shall govern this Consent Decree, with venue proper only in the Central District of California.

**D.** **Severability.** In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

**E.** **Correspondence and Notices.** Any and all notices and/or correspondence between the Parties provided for or permitted under this Consent Decree shall be in writing and personally delivered or sent by:

**1.** First-class (registered or certified) mail return receipt requested; or

**2.** Overnight or two-day courier; or

**3.** By email with confirmed receipt only (thus at the risk of the email sender); on any Party by the other Party to the following addresses:

If to Plaintiff:

Evan J. Smith, Esquire
Brodsky & Smith, LLC
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
T:      877.354.2590
Email:  esmith@brodskysmith.com

If to Arrowhead:

Arrowhead Brass & Plumbing, LLC
c/o Cory Chen and Ariel Garcia Brandt
5147 Alhambra Avenue
Los Angeles, CA 90032
T:      323.221.9137
Email:  cory.chen@arrowheadbrass.com
           ariel.garcia@arrowheadbrass.com

Stephen J. O'Neil, Esq.
Sheppard, Mullin, Richter & Hampton LLP
333 South Hope Street, 43rd Fl.
Los Angeles, CA 90071
T:      213.620.1780
Email:  soneil@sheppardmullin.com

Any change of address or addresses shall be communicated in the manner described above for giving notices.

**F.    Counterparts.**  This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopy, email of a .pdf signature, or facsimile copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

**G.    Modification of the Consent Decree.**  This Consent Decree, and any provisions herein, may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the Settling Parties, or upon motion of any Party as provided by law and upon an entry of a modified Consent Decree by the Court.  If any Settling Party wishes to modify any provision of this Consent Decree, the Settling Party must notify the other Settling Party in

SMRH:485078014.3

writing at least twenty-one (21) days prior to taking any step to implement the proposed change.

**H.  Full Settlement.**  This Consent Decree contains the sole and entire agreement and understanding of the Settling Parties with respect to the entire subject matter of this Consent Decree, and any and all discussions, negotiations, commitments and understandings related to this Consent Decree.  No representations, oral or otherwise, express or implied, other than those contained in this Consent Decree have been made by any party to it.  No other agreements not specifically referred to herein, oral or otherwise, shall be deemed to exist or to bind any of the Parties.

**I.  Integration Clause.**  This is an integrated Consent Decree.  This Consent Decree is intended to be a full and complete statement of the terms of the Consent Decree between the Settling Parties and expressly supersedes any and all prior oral or written Consent Decrees, covenants, representations, and warranties (express or implied) concerning the subject matter of this Consent Decree.

**J.  Authority of Counsel.**  The undersigned representatives for Plaintiff and Arrowhead each certify that he/she is fully authorized by the Party whom he/she represents to approve this Consent Decree as to form.

**K.  Authority.**  Arrowhead certifies that its undersigned representative is fully authorized to enter into this Consent Decree, to execute it on behalf of Arrowhead, and to legally bind Arrowhead to its terms.

**L.  Agreement to be Bound.**  The Settling Parties, including any successors or assigns, agree to be bound by this Consent Decree and not to contest its validity in any subsequent proceeding to implement or enforce its terms.

**X.  <u>COURT APPROVAL</u>**

The Parties hereby respectfully request that the Court promptly approve and enter this Consent Decree.  Upon entry of this Consent Decree, Plaintiff and

1  Defendant waive their respective rights to a hearing or trial on the allegations of the
2  Complaint and Notice which are at issue in this action. If this Consent Decree is not
3  approved by the Court, it shall be of no force and effect, and it may not be used in
4  any proceeding for any purpose.

5      **IN WITNESS WHEREOF**, the undersigned have executed this Consent
6  Decree as of the date first set forth below.

7

8  **SO AGREED AND APPROVED AS TO CONTENT**

9
10 Dated: _____          **PLAINTIFF**
11
12                                      Gary Lunsford
13
14 Dated: 1-16-2018                    **ARROWHEAD BRASS & PLUMBING, LLC**
15
16                                      By: _____
17                                         Its  Operations Direction
18
19 **APPROVED AS TO FORM**
20
21 Dated: January 16, 2018             **BRODSKY & SMITH, LLC**
22
23                                      By: _____
24                                         Evan J. Smith (SBN: 242352)
25                                         Attorneys for Plaintiff
26
27
28

-32-

Dated: January 17, 2018

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**

By: _____

STEPHEN J. O'NEIL (SBN: 127120)
Attorneys for Defendant
Arrowhead Brass & Plumbing, LLC

**IT IS SO ORDERED.**

DATED: August 4, 2018

_____

Percy Anderson
United States District Judge

SMRH:485078014.3

Case No. 2:16-cv-08373-PA-KS
CONSENT DECREE